IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SHACARLIA B. ROBINSON,                )
                                      )
          Plaintiff,                  )
                                      )
     v.                               )
                                      )   No. 08 C 6539
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
          Defendant.                  )
                                      )

## MEMORANDUM OPINION AND ORDER

Plaintiff Shacarlia Robinson ("Robinson") brought this action against the Commissioner ("the Commissioner") of the Social Security Administration seeking review of the Commissioner's denial of her application for supplemental security income ("SSI") under the Social Security Act ("SSA"), 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties have filed cross motions for summary judgment. For the reasons discussed below, I reverse the ALJ's decision and remand the case to the Social Security Administration for further proceedings. Accordingly, I deny the Commissioner's motion for summary judgment. I also deny Robinson's motion for summary judgment insofar as it seeks a reversal of the ALJ's decision for an award of benefits. However, to the extent that Robinson's motion requests in the alternative that the case be remanded for further proceedings, it is granted.

Shacarlia Robinson began complaining of severe headaches and severe neck and back pain in 2002. In June 2002, she underwent an MRI, which revealed a syrinx in her cervical spine (R. at 365) and she was diagnosed with syringomyelia.[1] Since that time, Robinson has continued to complain of headaches and of pain in her neck and back.

On November 9, 2005, she filed an application for supplemental security income. The claim was initially denied on April 10, 2006, and was denied upon reconsideration on July 20, 2006. Robinson filed a request for a hearing before an Administrative Law Judge ("ALJ"), which was held on August 9, 2007. (R. at 18.) A supplemental hearing was held on November 28, 2007. What follows is a summary of the testimony of the witnesses who appeared at the hearings.

---

[1] A syrinx is a "tubular cavity in the brain or spinal cord." *Stedman's Medical Dictionary* (27th ed. 2000). Syringomyelia develops when the syrinx expands and begins to destroy the center of the spinal cord. National Institutes of Health, National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/ syringomyelia/ syringomyelia.htm. "Since the spinal cord connects the brain to nerves in the extremities, this damage results in pain, weakness, and stiffness in the back, shoulders, arms, or legs." *Id.* Additional symptoms "include headaches and a loss of the ability to feel extremes of hot or cold, especially in the hands." *Id.* Unless it is treated surgically, syringomyelia "often leads to progressive weakness in the arms and legs, loss of hand sensation, and chronic, severe pain." *Id.*

## A. Robinson's Testimony

Robinson testified that she was 5'11" tall, and that she weighed 310 pounds. (R. at 56.) She reported having gained fifty pounds over the past several years. (R. at 36.) Robinson explained that she lived with her three children -- a sixteen year-old son, a thirteen year-old daughter, and a twelve year-old son. (R. at 26.)[2] She further stated that she received food stamps and a medical card. (R. at 28.) Robinson received schooling through the seventh or eighth grade (R. at 29, 513) during which time she received special education services (R. at 41-42).

Robinson testified that she slept most of the day, and that household chores were performed by her children and other family members. (R. at 23.) She stated that was unable to dress herself, and that for the past four or five years, her daughter had assisted her in putting on her clothes. Robinson reported that she was able to walk approximately the distance of a block between breaks (R. at 27) but that she was unable to travel alone (R. at 25). The farthest she had traveled, she stated, was to her doctor's office. (R. at 26.)

With respect to her symptoms, Robinson testified that she had experienced persistent and severe pain in her back, lower back, neck, and head. (R. at 26.) She also reported having difficulty

---

[2] At the hearing, Robinson appeared unsure of her youngest child's exact age. (R. at 26.)

getting up from a seated position. (R. at 27.) In addition, Robinson stated that she experienced bowel and bladder problems on a daily basis, and explained that the problem was a source of embarrassment for her. (R. at 27, 29.) She said that her headaches had gotten worse during the past two years. On a scale of one to ten (with ten representing the worst pain), she ranked her daily pain between seven or eight. (R. at 29.) Because of the pain, she testified that she was able to sleep only for periods of thirty minutes at a time. (R. at 36.) Robinson also reported difficulty in holding objects, and difficulty in picking up small objects. (R. at 34.)

In addition, Robinson stated that for the past two years, she had been treated for depression and had experienced difficulty concentrating. (R. at 34-35.) She reported taking several different medications for pain, as well as medications for asthma and high blood pressure. (R. at 33, 56-58.) These medications, she testified, made her jittery and drowsy. (R. at 33.)

As for her employment, Robinson testified that her most recent job was in 2006 with the Church of Joy, where she provided childcare services for two to three hours per day. (R. at 37, 40-42, 46-47.) She further reported that, with her children's assistance, she had also occasionally earned money by providing childcare services from her home. (R. at 48, 62.)

## B.  Dr. Rudolph's Examination

During Robinson's testimony at the hearing, she appeared to have difficulty understanding and answering certain of the ALJ's questions -- particularly questions concerning her prior work history.  (R. at 48-49.)  As a result, the ALJ ordered that she undergo a psychological examination.  (R. at 50.)  On September 7, 2007, Robinson was evaluated by Dr. Gregory C. Rudolph ("Dr. Rudolph").  Dr. Rudolph administered the Wechsler Adult Intelligence Scale (WAIS) - III, Revised.  (R. at 515.)[3]  He found that Robinson had a full score IQ of 46, a verbal IQ of 51, and a performance IQ of 50.  (R. at 515.)  Dr. Rudolph further observed that these scores placed Robinson in "**the lower portion of the mild**

---

[3]  The Wechsler Adult Intelligence Scales test is "the standard instrument in the United States for assessing intellectual functioning." *Atkins v. Virginia*, 536 U.S. 304, 309 n.5 (2002).  As the Supreme Court has explained:

> The WAIS-III is scored by adding together the number of points earned on different subtests, and using a mathematical formula to convert this raw score into a scaled score. The test measures an intelligence range from 45 to 155. The mean score of the test is 100, which means that a person receiving a score of 100 is considered to have an average level of cognitive functioning. A. Kaufman & E. Lichtenberger, *Essentials of WAISIII Assessment* 60 (1999).  It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition. 2 *Kaplan & Sadock's Comprehensive Textbook of Psychiatry* 2952 (B. Sadock & V. Sadock eds. 7th ed.2000).

*Id.*

**mentally handicapped range to the moderate mentally handicapped range.**" (R. at 515) (emphasis in original).

In his report accompanying the test results, Dr. Rudolph noted that while Robinson exhibited no memory problems and possessed good knowledge of general information, she experienced difficulty performing rudimentary mathematical computations (for example, she counted her fingers to calculate that 5 + 4 equaled 9, and she was unable to solve equations such as "10 - 6" and "4 x 6"). (R. at 512, 514.) Dr. Rudolph further explained that Robinson was able to exercise her judgment, but that she had poor reasoning skills (for example, when asked in what way a tree and a bush were alike, she answered that both were brown; she was unable to indicate any ways in which a tree and bush were different). (R. at 512, 515.)

According to Dr. Rudolph, Robinson was able to take care of herself and her personal needs, but she was unable to go shopping by herself and did not know how to make change when making purchases. (R. at 514.) In addition, Dr. Rudolph concluded that Robinson suffered from Post Traumatic Stress Disorder ("PTSD") and Generalized Anxiety Disorder. (R. at 512.) Overall, he reported that Robinson had put forth good effort during the test. He concluded that the "**evaluation appears to be considered <u>valid</u> and appears to be commensurate with [Robinson's] educational level and her level of adaptive functioning.**" (R. at 515) (emphasis in original).

## C.    Dr. Rosenfeld

After Dr. Rudolph's evaluation, a supplemental hearing was held in November 2007.  (R. at 52.)  At the hearing, the ALJ heard testimony from three experts: Dr. Ellen Rosenfeld, Ph.D. ("Dr. Rosenfeld"), a clinical psychologist; Dr. Ashok Jilhewar, M.D. ("Dr. Jilhewar"), an internist; and Frank M. Mendrick ("Mendrick"), a vocational expert.

During her testimony, Dr. Rosenfeld disputed the accuracy of the test results reported by Dr. Rudolph.  (R. at 63.)  According to Dr. Rosenfeld, Robinson's IQ scores were inconsistent with other evidence in the record.  (R. at 64-65.)  In particular, Dr. Rosenfeld pointed to the fact that Robinson was able to care for herself; that she had raised her own children and had performed daycare services for other children; that she had previously worked as a cashier; and that she could write and was able independently to fill out the "daily living form" submitted as part of her SSI application.  (R. at 65.)  Dr. Rosenfeld stated that none of these tasks could have been performed by a person with an IQ in the range found by Dr. Rudolph.  (R. at 65.)

Furthermore, Dr. Rosenfeld observed that no cognitive impairment had been noted during any of Robinson's medical evaluations prior to her consultation with Dr. Rudolph in September 2007.  (R. at 63, 80.)  This suggested, she stated, that whatever Robinson's current level of cognitive functioning might be, it was

unlikely that it could be traced very far back in her medical history. (R. at 65, 69-70.) Nevertheless, Dr. Rosenfeld acknowledged that Dr. Rudolph was a seasoned evaluator. (R. at 74.) Based on her review of the record, Dr. Rosenfeld recommended that, due to Robinson's difficulties in concentration and "mood regulation," Robinson be limited to jobs that involve operations of a simple and routine nature. (R. at 72.)

## D. Dr. Jilhewar

The ALJ next heard testimony from Dr. Jilhewar. Dr. Jilhewar reviewed Robinson's medical records and opined that her complaints of neck and back pain could not be explained by objective findings. (R. at 83.) He stated that Robinson's complaints had begun when she visited a hospital emergency room in April 2002, apparently after a physical confrontation with the police. (R. at 24-25.) As characterized by Dr. Jilhewar, an MRI taken approximately one month later showed "only minimal disc bulge at C4-5." He opined that this could not account for Robinson's pain. (R. at 84.) Dr. Jilhewar also described "an incidental finding of syrinx . . . from C4 level to C7 level," but he added that the consulting neurologist had not documented any degenerative changes in Robinson's spinal cord or in her motor or sensory systems. (R. at 84.)

Dr. Jilhewar next noted that Robinson had a neurological consultation with Dr. M. Elena Gragasin ("Dr. Gragasin") in October 2003. He stated that Dr. Gragasin had observed Robinson's gait to

be normal and that Robinson had a full range of movement in her neck. (R. at 84, referring to Tr. 414.) Dr. Jilhewar also observed that Dr. Gragasin had stated in her notes that Robinson's syrinx had not grown since the previous MRI and that Dr. Gragasin had opined that the syrinx was "most likely an incidental finding." (R. at 84 citing 414.) Dr. Gragasin had ordered an MRI exam of Robinson's lumbar spine because of Robinson's complaints of pain. The test showed a minor disc bulge with a facet,[4] as well as joint degenerative changes at L5-S1. However, Dr. Jilhewar stated, Dr. Gregasin saw no effect on Robinson's spinal canal. (R. at 85.)

On December 17, 2003, Robinson had a neurological consultation with Dr. Herbert H. Engelhard ("Dr. Engelhard") due to the syrinx. (R. at 86, referring to R. at 420.) As Dr. Jilhewar explained, Dr. Engelhard stated that if Robinson's neurological condition were to deteriorate, she might be treated surgically. (R. at 86, referring to R. at 420.) Dr. Jilhewar also noted that Robinson's regular doctor followed her complaints of neck and back pain. He observed, however, that none of Robinson's neurologists or neurosurgeons found her to be suffering from any motor weakness. (R. at 88.)

On November 30, 2004, Robinson was admitted to the Emergency Room ("ER") at John H. Stroger, Jr. Hospital in Chicago, Illinois. (R. at 87, referencing R. at 451-52.) At that time, the ER staff

---

[4] A facet is a "small smooth area on a bone or other firm structure." *Stedman's Medical Dictionary* (27th ed. 2000).

reported that Robinson's gait was normal.  (R. at 87.)  However,

she was assessed with chronic neck and back pain, and was referred

for another neurological consultation.  (R. at 87.)[5]  She underwent

another MRI on April 5, 2005.  According to Dr. Jilhewar's review,

the results were the same as those shown in Robinson's previous MRI

(R. at 87.)

Lastly, Dr. Jilhewar testified that there was a conflict

between the assessments of Robinson reached by two doctors in the

same office.  (R. at 88.)  The first exam, performed by Dr. Michael

K. Raymond ("Dr. Raymond"), took place in March 2004.  (R. at 88.)

Dr. Raymond noted that Robinson's motor strength was "3/5."  (R. at

88.)  He also explained that Robinson's Romberg test[6] was positive,

but the results of her cerebellar tests were negative.  (R. at 88.)

---

[5] Dr. Jilhewar's testimony is somewhat unclear on this
point, due to the fact that certain of his remarks appear to have
been inaudible during the hearing. Specifically, in reporting the
findings from the January 7, 2005 consultation, Dr. Jilhewar
stated that Robinson's "motor system was normal with a strained
(INAUDIBLE)."  (R. at 87.)  His remarks could not be clarified by
examining the documents referred to (R. at 449-57, Hearing Ex.
20F) because most of the writing contained in them is illegible,
and what information is legible makes no mention of a sprain.

[6] "The Romberg test is an equilibrium test that may reveal
deficiencies in the manner in which position signals are sent to
the brain." *Gardner-Cook v. Sec'y of Health and Human Servs.*, 59
Fed. Cl. 38, 39-40 (Fed. Cl. 2003) (citing *Stedman's Medical
Dictionary* 1640 (27th ed. 2000)). The test is administered by
having the patient stand with her eyes closed and her feet
together. The examiner then pushes the patient slightly to
determine whether she is able to regain her posture. *See, e.g.,
Hughes v. Comm'r of Soc. Sec.*, No. 1:08-cv-700, 2009 WL 2590195,
at *3 n.4 (W.D. Mich. Aug. 19, 2009).

In March 2006, a physician from the same office, Dr. Scott A. Kale ("Dr. Kale"), reported that Robinson's grip was "5/5." (R. 89.) Dr. Kale also observed that although Robinson's gait was slow, he saw no sign of motor weakness. (R. at 89.) Still further, Dr. Kale stated that Robinson's Romberg test was negative.

Given these conflicting findings, Dr. Jilhewar expressed doubt about Dr. Raymond's 2004 assessment. According to Dr. Jilhewar, in the vast majority of cases, a positive Romberg test is accompanied by cerebellar signs. Dr. Raymond, however, had reported a positive Romberg test but negative cerebellar test results. (R. at 88.)

On the basis of his review, Dr. Jilhewar concluded that, given Robinson's obesity and her complaints of pain, she should be restricted to sedentary work. (R. at 92-93.) Furthermore, he concluded that due to her history of bronchial asthma, Robinson should be limited to a controlled working environment, such as an office, that was free of pulmonary irritants. (R. at 93.)

**E.    Vocational Expert Mendrick's Testimony**

Finally, the ALJ heard testimony from Frank M. Mendrick, a vocational expert. The ALJ asked Mendrick what jobs could be performed by an individual fitting Robinson's description, namely, someone who had an eighth-grade education; who had received special education services as a child; who could perform only routine, repetitive work with no novelty; who was not be to involved with the public or required to engage in extended oral or written

communications; who was capable of a restricted range of sedentary work (occasional bending, stooping, crawling, kneeling, crouching); who was capable of occasionally lifting up to ten pounds, and capable frequently of lifting less than ten pounds; who had the ability to sit for six hours, to stand and walk for two hours, and to work only on level surfaces. (R. at 99.) Mendrick responded that such an individual would be limited to sedentary factory jobs consisting of no more than three steps. (R. at 100.) As examples of such jobs, he cited general assembly work, simple inspection, and work as a bench hand. (R. at 100.)

**F.   The ALJ's Opinion**

On December 26, 2007, the ALJ issued an opinion concluding that Robinson was not disabled within the meaning of the Social Security Act. (R. at 117-28.) The ALJ opined that Robinson suffered from several severe impairments, including morbid obesity, a C4-C7 syrinx with minimal degenerative arthritis, L5-S1 facet arthropathy with minimal degenerative arthritis, hypertension, and situational depression. (R. at 120.) However, the ALJ stated that Robinson did not suffer from an impairment or combination of impairments that met or equaled those specifically listed as disabilities in 20 CFR Part 404, Subpart P, Appendix 1. Specifically, the ALJ stated that he had inquired into whether Robinson met the requirements for organic brain dysfunction (12.02), affective disorders (12.04), mental retardation (12.05),

anxiety disorder (12.06), chronic heart failure (4.02), and disorders of the back (1.04). (R. at 120.) He found that Robinson failed to meet the requirements for any of these listings. The ALJ concluded that Robinson possessed the residual functional capacity ("RFC") to perform "routine, repetitive, sedentary work on level surfaces subject to only occasional bending, stooping, crawling, crouching, and kneeling." (R. at 123.) Based on his review of the record and the testimony presented at the hearing, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. at 126.) The ALJ cited the same examples as those offered by Mr. Mendrick at the supplemental hearing: general assemblers, inspectors, and bench workers. (R. at 126.) Accordingly, the ALJ denied Robinson's application for SSI.

## II.

### A. Standard of Review

Since the Appeals Council denied Robinson's request for review, the ALJ's opinion represents the final decision of the Commissioner. *See, e.g.*, *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). Under the SSA, the Commissioner's findings are to be reversed if they are not supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). As courts have explained, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Dixon*, 270 F.3d at 1176. An ALJ is not required to address every piece of evidence or testimony in the record. *See, e.g.*, *Getch*, 539 F.3d at 480. However, a court "cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

An ALJ's opinion must also be reversed if he has committed a legal error, regardless of how much evidence supports the ALJ's determination. *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). An ALJ commits a legal error when he fails to comply with the Commissioner's regulations and rulings. *See, e.g.*, *Elbert v. Barnhart*, 335 F. Supp. 2d 892, 896 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)).

## B.   **The Social Security Act**

To qualify for SSI, a claimant must be "disabled" within the meaning of the SSA. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009) (citing 42 U.S.C. § 423(a)(1)(E)). The SSA defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A)). Social Security

regulations set forth a sequential, five-step inquiry that must be conducted to determine whether a claimant satisfies this definition. *Liskowitz*, 559 F.3d at 739 (citing 20 C.F.R. §§ 404.1520, 416.920). Specifically, the ALJ must determine:

> (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy.

*Dixon*, 270 F.3d at 1176 (citing 20 C.F.R. § 404.1520).

Robinson claims that the ALJ committed several errors in conducting this inquiry. In particular, she contends that the ALJ erred by: (1) failing to consider whether she was disabled under Listing 11.19 by virtue of her syringomelia; (2) not accepting the results of the IQ test administered by Dr. Rudolph, or, alternatively, by not requesting another psychological examination to resolve the conflict between Dr. Rudolph's and Dr. Rosenfeld's opinions regarding Robinson's level of cognitive functioning; (3) failing to discuss and explain the reasoning behind the relative weight he assigned to the conflicting opinions of Drs. Rudolph and Rosenfeld; (4) failing to discuss the weight he assigned to the State agency doctor's opinion; (5) failing to make a credibility determination concerning Robinson's testimony; and (6) failing to consider Robinson's obesity in combination with her other impairments.

As is discussed more fully below, Robinson decisively prevails on all of these arguments except (3) and (5). The latter arguments, while cogent, present somewhat closer questions. Since the case will be remanded on the basis of Robinson's other arguments, it is unnecessary to decide whether (3) and (5) constitute additional independent grounds for remanding the case. Regardless of whether the problems raised by arguments (3) and (5) are grounds for reversal, however, the ALJ should address them on remand.

**B.    Syringomyelia: Listing 11.19**

Robinson first argues that the ALJ erred in failing to discuss whether she is disabled with syringomyelia under Listing 11.19. I agree. It is well-settled that "an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a perfunctory analysis, may require a remand." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (quotation marks omitted). Here, the ALJ failed to discuss, or even mention, either syringomyelia or Listing 11.19. Consequently, the case must be remanded for consideration of this issue.[7]

_____

[7] To be sure, Robinson herself did not explicitly identify syringomyelia as a basis for her claim of disability. However, an ALJ is required to consider not only those impairments asserted by claimant, but also those about which the ALJ has received evidence. *See, e.g., Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ is required to consider impairments a claimant says he has, or about which the ALJ receives evidence. Although [the claimant] did not specifically claim obesity as an impairment (either in his disability application or at his

Against this, the Commissioner argues that it was unnecessary for the ALJ to discuss syringomyelia because, based on the record evidence, there was there was no legitimate question as to whether Robinson met the Listing's criteria. For example, the Commissioner points out that a mere diagnosis of syringomyelia, without more, is not enough to meet the specific requirements of Listing 11.19. Rather, the Listing also requires that a claimant's syringomyelia be accompanied either by "[s]ignificant bulbar signs," or by "[d]isorganization of motor function as described in 11.04B." 20 C.F.R. Pt. 404, Subpt. P, App. 1., Rule 11.19. In turn, the motor

---

hearing), the references to his weight in his medical records were likely sufficient to alert the ALJ to the impairment.") (citation omitted); *Cannon v. Harris*, 651 F.2d 513, 519 (7th Cir. 1981) ("Although it is true that plaintiff did not specifically list alcoholism as a cause of her claimed disability in her application for benefits, this fact is of little import . . . . Under these circumstances, the ALJ should have inquired into the present status and possible effects of plaintiff's chronic alcoholism."); *see also Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) ("This circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate.").

The record in this case contained significant evidence that Robinson suffered from syringomyelia. In addition to the fact that she had been diagnosed with the condition, she continued to complain repeatedly of symptoms associated with syringomyelia -- especially severe head and neck pain, and numbness and tingling in her extremities. Indeed, the ALJ himself acknowledged that Robinson had "C4-C7 syrinx with minimal degenerative arthritis" (R. at 120) and even identified the condition as a "severe impairment" (R. at 120). Strangely, however, the ALJ failed to make any inquiry into whether Robinson was disabled with syringomyelia within the meaning of Listing 11.19.

function difficulties described in Listing 11.04B are "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)."[8] According to the Commissioner, there was a lack of evidence suggesting that Robinson's syringomyelia was accompanied by any disorganization in her motor functioning. Commissioner's Br. at 7.

For several reasons, the Commissioner's argument is unpersuasive. First, it is simply incorrect to say that the record contained no evidence that Robinson's syringomyelia was accompanied by the additional symptoms described in Listing 11.04B. On the contrary, the record contains clear evidence that Robinson experienced significant and persistent disorganization of her motor functioning, and sustained disturbances of her gross and dexterous movements. Specifically, Robinson cites the following examples:

---

[8] Listing 11.00C reads:

Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

20 C.F.R. Pt. 404, Subpt. P, App. 1., Rule 11.00C.

Dr. Gragasin's note that Robinson experienced numbness in her arms, hands and feet (R. at 426); Dr. Kale's report that Robinson had decreased sensation to temperature in her upper and lower extremities (R. at 429); Dr. Kale's report that as the disease progressed, Robinson complained of numbness and tingling with loss of balance and strength (R. at 428); the report of Physician's Assistant Lisa Fields regarding Robinson's chronic lower back pain secondary to a herniated disc, which noted that Robinson experienced pain with movement and had developed a loss of sensation in her legs (R. at 401); and Fields's opinion that Robinson was unable to engage in lifting as a result of her back pain (R. at 404). This evidence supports a finding that Robinson experienced "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station," 20 C.F.R. Pt. 404, Subpt. P, App. 1., Rule 11.04B, as required by Listing 11.19 and as further described by Listing 11.04B.

The Commissioner claims that the above-mentioned evidence is ultimately insufficient to support a finding of disability. But this misses the point: the question is not whether the ALJ should have concluded that Robinson met Listing 11.19's requirements; it is only whether the evidence was substantial enough to require the ALJ to discuss the Listing. Indeed, in arguing that the ALJ was not required to discuss Listing 11.19 due to the insufficiency of

the evidence, the Commissioner puts the cart before the horse.  It is only after reviewing the evidence that the ALJ could have made an informed determination as to whether the Listing's requirements had been met.  *Cf. Celaya v. Halter*, 332 F.3d 1177, 1181-82 (9th Cir. 2003) ("The argument that since plaintiff did not meet the listed criteria for obesity, her obesity need not be considered in a multiple impairments analysis gets things backwards.  If a claimant does meet the listing criterion for one or more impairments, she is judged to be disabled without the need to conduct any further analysis. It is precisely when a condition falls short of the criterion, as here, that such an analysis is appropriate.").  This argument might hold some force if there record were completely devoid of any evidence of syringomyelia.  As recounted above, however, that is plainly not the case here.

To be sure, the Commissioner offers reasons for concluding that Robinson's evidence failed to meet Listing 11.19's requirements.  My review of the ALJ's decision, however, is confined to the reasons specifically *articulated by the ALJ*.  As the Seventh Circuit has explained, "regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ."  *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *see also Golembiewski v. Barnhart* , 322

F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). The question here is whether the ALJ engaged in the required analysis, not whether, if the ALJ had engaged in the required analysis and had found against Robinson, that conclusion would have been supported by substantial evidence. *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

The Commissioner goes on to observe that the ALJ's opinion makes at least some mention of symptoms relevant to Listing 11.19. At one point, for example, the ALJ discusses Robinson's complaints about the numbness in her hands and feet and he suggests that these were ultimately insignificant. (R. at 124.) But the relevance of these remarks is unclear. Once again, there is no indication that these remarks were intended to address Listing 11.19. And even if the ALJ's remarks could be so construed, they would hardly constitute an adequate analysis of the issue. To the extent that the ALJ touches on symptoms such as the tingling in Robinson's extremities, his discussion is far too one-sided and superficial, ignoring entirely the evidence indicating that the symptoms were in fact serious. As noted above, Robinson testified that she had trouble grasping and holding objects. (R. at 32-34.) The problems of numbness, tingling, and loss of strength were also noted by Dr. Gragasin (R. at 426) Dr. Kale (R. at 428 & 429) and Ms. Fields (R.

at 386).[9]  An ALJ cannot limit his discussion to the evidence that supports his conclusion.  "While the ALJ need not articulate his reasons for rejecting every piece of evidence, he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position."  *Godbey*, 238 F.3d at 808.

In short, because the ALJ's opinion fails to discuss or even acknowledge the question whether Robinson meets the requirements of Listing 11.19, I am unable to meaningfully review the ALJ's conclusion that Robinson fails to meet the requirements of any listed impairment and that she is therefore not disabled within the meaning of the SSA.  Accordingly, I must remand the case back to the Social Security Administration for further proceedings.  On

---

[9] In her briefs, Robinson cites the ALJ's failure to discuss her limitations in using her hands and feet as a separate basis for reversing the ALJ's decision.  *See* Pl.'s Br. at 13. Specifically, Robinson argues that the ALJ was required to discuss this evidence under Social Security Ruling 96-8p, which requires that the narrative discussion of the ALJ's RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."  Robinson also argues that the ALJ was required to discuss the evidence under SSR 06-3p, which clarifies how the Social Security Administration takes account of opinions from sources "other than accepted medical sources," including Physicians' Assistants such as Lisa Fields.  Robinson's argument on these points are advanced only briefly, and it clearly overlaps with her more general argument concerning the ALJ's failure to discuss Listing 11.19.  In light of my holding that the case must be remanded for a consideration of whether Robinson meets Listing 11.19's requirements, it is unnecessary to give separate consideration to her arguments specifically relating to her ability to use her hands and feet.  Naturally, however, the ALJ should consider the latter evidence on remand in light of SSR 96-8p and SSR 06-3p.

remand, the ALJ should include in his analysis a discussion as to whether Robinson meets or equals the criteria enumerated in Listing 11.19.

## C.   **Mental Retardation: Listing 12.05**

Even if the ALJ had not erred in failing to discuss Listing 11.19, it would nonetheless be necessary to remand the case due to the ALJ's treatment of whether Robinson met the criteria for mental retardation under Listing 12.05.  Here the problem is not that the ALJ failed to consider Listing 12.05; instead, the difficulty is the ALJ's failure to properly address the conflict between the findings of Dr. Rudolph and Dr. Rosenfeld.

Listing 12.05 defines mental retardation in the following terms:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> Or
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
> Or

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

As noted above, Dr. Rudolph reported on the basis of his testing that Robinson had a full score IQ of 46, a verbal IQ of 51, and a performance IQ of 50. Although these scores fall well within the range set forth in Listing 12.05, Dr. Rosenfeld opined that these results were inaccurate because they were inconsistent with many of the tasks that Robinson had shown the ability to perform (such as working as a cashier, filling out SSA forms, etc.). Dr. Rosenfeld also stated that, even if the scores were an accurate reflection of Robinson's current level of intellectual functioning, there was no evidence in the record to suggest that she was similarly impaired before reaching age 22 -- a necessary condition for any finding of retardation under Listing 12.05. Furthermore, Dr. Rosenfeld suggested that if Robinson were as mentally impaired as Dr. Rudolph's assessment indicated, it would be difficult to

explain why her condition had never been noted anywhere else in her medical history.

The ALJ cited these aspects of Dr. Rosenfeld's testimony in concluding that Robinson did not qualify as mentally retarded under Listing 12.05. (R. at 121.) However, these considerations do not form a "logical bridge" leading to the ALJ's determination. For even if Robinson's IQ were in fact significantly higher than Dr. Rudolph's evaluation indicated, her degree of mental incapacity might still have fallen within the range contemplated under Listing 12.05. Under 12.05(C) or (D), for example, Robinson's IQ could have been as high as 70 and (assuming that other criteria were met) she still would have satisfied the Listing's definition of mental retardation. Pl.'s Br. at 10-11.

Dr. Rosenfeld offered no alternative assessment of Robinson's IQ. Rather, her testimony focused devoted almost exclusively to challenging the accuracy of Dr. Rudolph's specific findings. Thus, Dr. Rosenfeld's testimony does not support the conclusion that Robinson suffers from no cognitive impairment. At most, her testimony suggests that Robinson does not suffer from *mild-to-moderate* retardation.[10]

_____

[10] It is true Dr. Rosenfeld makes an occasional passing remark which seem to suggest that the record lacked any evidence tending to show that Robinson was affected by any level of cognitive impairment. For example, at the very beginning of her testimony, Dr. Rosenfeld stated that "the record is unusual in the sense that there really was no evidence of a mental impairment prior to the recent [clinical evaluation] by Dr.

The Commissioner argues that the ALJ's determination was nevertheless correct because Listing 12.05 requires a showing that Robinson's cognitive impairment existed prior to her having reached twenty-two years of age.  But the record does not positively establish that Robinson fails to meet this requirement; the record is simply unclear on this point.  True, Dr. Rosenfeld testified that there was no evidence that Robinson was cognitively impaired prior to age twenty-two.  Once again, however, her testimony was focused specifically on the accuracy of the IQ scores reported by Dr. Rudolph.  Understood in context, therefore, Dr. Rosenfeld's claim was that there was no evidence to indicate that Robinson suffered from *mild-to-moderate* mental retardation prior to age twenty-two.  In other words, Dr. Rosenfeld's testimony fails to rule out the possibility that, prior to reaching age twenty-two, Robinson suffered from a milder form of retardation -- one that might have not have been remarked upon earlier in her medical history but nonetheless serious enough to fall within Listing

_____

Rudolph in September of '07."  (R. at 63.)  Taken as a whole, however, Dr. Rosenfeld's claims are limited to whether the record supports Dr. Rudolph's specific findings.  Moreover, even if Dr. Rosenfeld could be viewed as advancing the stronger claim that the record contained no evidence of any degree of mental retardation, her opinion still would not provide a basis for the ALJ's conclusion regarding Listing 12.05.  At no point in her testimony, for example, does Dr. Rosenfeld explain why Robinson's level of functioning would be inconsistent with an IQ of 70.  Thus, if the ALJ regarded Dr. Rosenfeld as opining that Robinson showed no signs of mental retardation, his conclusion would be without substantial support in the record.

12.05's ambit. Nor does such a possibility lack support in the record. That Robinson suffered from some degree of cognitive impairment in her youth is suggested, for example, by the fact that she received special education services as a student.

It is true that, as the claimant, Robinson bears the burden of proving her disability. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). At the same time, however, "the ALJ in a Social Security hearing has a duty to develop a full and fair record." *Id.*; *see also Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007)(" An ALJ has a duty to fully develop the record before drawing any conclusions."). "Failure to fulfill this obligation is good cause to remand for gathering of additional evidence." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). Regardless of whether the IQ scores reported by Dr. Rudolph are completely accurate, they serve as powerful evidence that Robinson suffered from some degree of cognitive impairment. Given the ambiguity created by the contrasting views of Drs. Rudolph and Rosenfeld, the ALJ had an obligation to develop the record more fully. The ALJ should have considered such alternative possibilities, or at least explained why he felt further inquiry was unnecessary. This constitutes a second, independent reason why the case must be remanded. Accordingly, on remand, the ALJ should explore in greater depth the precise extent of Robinson's cognitive impairment, and should seek to determine with greater reliability whether and such impairments

predated Robinson's reaching 22 years of age.

## D.  **Weight Given to the State Agency Doctor's Opinion**

Robinson further argues that the ALJ erred in failing to discuss the weight he assigned to the opinion of the State agency's doctor, Dr. Barry Free, M.D.  Once again, I agree.

Social Security Ruling 96-6p provides that "[f]indings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review."  SSR 96-6p.  In addition, the Ruling states that "[a]dministrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions."  Still more specifically, 20 C.F.R. § 416.927(f)(2) requires an ALJ to consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence," even though the findings made by such consultants are not binding on the ALJ. 20 C.F.R. § 416.927(f)(2)(i).[11]

---

[11] Section 416.927(f)(2) also sets forth the criteria according to which an ALJ must evaluate a State agency doctor's findings. For example, 20 C.F.R. § 416.927(f)(2)(ii) states:

When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician or psychologist, the administrative law

Robinson met with Dr. Free both in May 2003 and in March 2004 (R. at 439.) The reports that Dr. Free issued in connection with these consultations appear highly relevant to assessing Robinson's condition. For example, the hand-written notes included in the May 2003 report signed by Dr. Free reflect Robinson's statement that she "can stand or walk for 2-3 hours before needs to sit" (R. at 412) and that she "must switch back and forth from sitting to standing & vice versa every 30 minutes due to back pain," (R. at 412). The report ends with the notation: "medical evidence in file supports this." (R. at 412.) Further, in a March 2004 report, Dr. Free noted that an earlier MRI had found "a syringohydromyelia in the C-spine with bulging at C5-C6. (R. at 439.) Along with his other comments regarding the physical examination, Dr. Free notes "reflexes decreased in all extremities" (R. at 439) and "sensation is decreased for temperature in all extremities as well" (R. at 439). The ALJ's opinion plainly ignored Dr. Free's reports, and offered no explanation concerning any weight that he might have assigned to it.

---

judge will evaluate the findings using relevant factors . . . such as the physician's or psychologist's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations provided by the physician or psychologist, and any other factors relevant to the weighing of the opinions.

20 C.F.R. § 416.927(f)(2)(ii).

The Commissioner's response to this argument is terse to the point of being elliptical. The Commissioner merely notes that Dr. Jilhewar commented that his opinion regarding Robinson's condition was different from that of the State agency's physicians. Commissioner's Br. at 13. However, the Commissioner does not suggest that this passing remark was sufficient to fulfill the ALJ's obligation to explain the weight assigned to Dr. Free's opinion. The case must be remanded so that this defect can be remedied.

**E.  Consideration of Robinson's Obesity in Light of Her Other Impairments**

Finally, Robinson argues that the ALJ erred in failing to consider the effect of her obesity on her other impairments. Once more I agree.

The Seventh Circuit has made it abundantly clear that "under S.S.R. 02-1p the ALJ must specifically address the effect of obesity on a claimant's limitations because, for example, a person who is obese and arthritic may experience greater limitations than a person who is only arthritic." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *see also Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000) ("While Clifford may not meet the Listing requirements for obesity, she is 5'3" and significantly overweight at 199 pounds. The ALJ, rather than blind himself to this condition . . . should have considered the weight issue with the aggregate effect of her other impairments."). An inquiry into the

effect of obesity on a claimant's other impairments is required even where a claimant does not specifically allege that he or she is obese. *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006) ("According to SSR 02-1p, an ALJ should consider the effects of obesity together with the underlying impairments, even if the individual does not claim obesity as an impairment.").

Here, the ALJ's opinion contains no discussion of whether (or to what extent) Robinson's obesity might have exacerbated her other debilitating conditions. The Commissioner's attempt to defend the ALJ's opinion on this point is half-hearted at best, merely pointing out that the ALJ mentioned SSR 02-1p's requirements at Robinson's hearing. Commissioner's Br. at 14. Simply reciting the Ruling's requirements during the hearing is plainly no substitute for a full-fledged analysis applying the Ruling's requirements to the facts of Robinson's case.

The Commissioner appears to suggest that the ALJ somehow took account of Robinson's obesity in an indirect fashion. He notes, for example, that "the medical expert [Dr. Jilhewar] stated that the record did not show that Plaintiff could not do her daily activities due to obesity," and that the expert "testified that he limited Plaintiff to sedentary work, rather than light work, as found by the state agency physicians, due to a combination of her obesity and complaints of pain." Commissioner's Br. at 14 (citations omitted). In relying on these experts, the Commissioner

appears to contend, Robinson's obesity was implicitly factored into the ALJ's findings.

However, even assuming that I could properly impute to the ALJ the medical experts' consideration of the effect of Robinson's obesity on her other ailments, the ALJ's discussion still falls far short of the necessary inquiry under SSR 02-1p. Dr. Jilhewar is the only expert alleged to have taken account of the interplay between Robinson's obesity and her other conditions. And even Dr. Jilhewar's consideration of the issue is exceedingly limited: as noted above, he stated merely that he took the combined effect of Robinson's pain and her obesity into account in coming to the conclusion that Robinson should be limited to sedentary work. (R. at 93.)

In short, the ALJ's failure to properly consider Robinson's obesity in concert with her other ailments is yet another basis on which remand is necessary.

### III.

Each of the arguments discussed above represents an independent ground for reversing and remanding the ALJ's opinion. In addition to these claims, however, Robinson contends that the ALJ erred in two further ways. Specifically, she argues that the ALJ failed: (1) to explain the relative weight he assigned to the

conflicting opinions of Dr. Rudolph and Dr. Rosenfeld;[12] and (2) to make an explicit determination regarding her credibility.[13]  While Robinson raises serious questions about the adequacy of the ALJ's opinion in these respects, it is not entirely clear whether, in and of themselves, they constitute bases for reversal.

With respect to the first issue, for example, it is true that the ALJ's opinion contains no statement of the form, "I give $x$ weight to Dr. Rosenfeld's opinion, and $y$ weight to Dr. Rudolph's opinion."  Nevertheless, it is possible to gauge with some accuracy the relative weight the ALJ assigned to each doctor's opinion. Essentially, the ALJ appears to accept Dr. Rosenfeld's assessment

_____

[12] 20 C.F.R. § 416.927 identifies several factors to be taken into consideration in determining how much weight to give to the opinions of various experts, including: the examining relationship; the treatment relationship (including both the length and nature of the relationship); consistency; specialization; as well as "other factors" that might be relevant to the determination.  20 C.F.R. § 416.927.  Furthermore, Social Security Ruling 96-2p explains that section 404.1527 "requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)," SSR 96-2p, and that when a determination is a denial, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record," and must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," *id.*

[13] SSR 96-7p provides that an ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."

over Dr. Rudolph's on virtually every issue under consideration. Moreover, although the ALJ does not discuss the matter in the most orderly or systematic fashion, the opinion contains at least some specific reasons for relying more heavily on Dr. Rosenfeld's assessment than on Dr. Rudolph's. For example, the ALJ notes at one point that Dr. Rosenfeld "had worked extensively with the developmentally disabled and was familiar with the typical functioning of individuals scoring in the intellectual range measured by Dr. Rudolph. (R. at 121.) In addition, the ALJ pointed out that, unlike Dr. Rosenfeld, Dr. Rudolph did not have access to Robinson's longitudinal chart and thus was unable to view the results of Robinson's IQ tests within any degree of historical perspective. (R. at 121-22.)

The problem, however, is that the ALJ's analysis contains significant gaps. For example, the ALJ often reaches a conclusion by simply recounting Dr. Rosenfeld's testimony, omitting any explanation as to why he has accepted Dr. Rosenfeld's testimony over countervailing evidence. At one point, for example, the ALJ reasons as follows:

> On balance, Dr. Rozenfeld [sic] inferred that the assessment of Dr. Rudolph merited only limited wieght because it was dependent upon incomplete longitudinal documentation and the claimant's subjectively-inconsistent account. She inferred that the claimant remained able to sustain simple, routine work. The undersigned, therefore, concludes that the claimant has only mild daily living activity limitations, moderate social functioning limitations, and moderate deficiencies of concentration, persistence or pace.

(R. at 122.)  As can be seen, the discussion here consists of little more than a recitation of Dr. Rosenfeld's testimony.  No explanation is given concerning why Dr. Rosenfeld's testimony is to be accepted on each of these points.

Similarly, with respect to issue (2) above, while the ALJ's opinion contains some remarks concerning Robinson's credibility, these are not presented in an organized fashion.  At some places in the opinion, the ALJ clearly expresses doubt about the veracity of Robinson's testimony.  For example, during the hearings, Robinson disclosed that she had earned roughly $6,000 by providing childcare services from her home.  (R. at 37.)  When asked why she had not paid taxes on the earnings, she claimed that she was unaware that she was under any obligation to do so. (R. at 44.)  The ALJ registered his skepticism regarding this claim, noting that Robinson had hired a professional to prepare her tax return for that year.  (R. at 120.)

The difficulty, however, is that the ALJ never sums up his assessment of Robinson's credibility in clear and concise terms.  As a result, the reviewer is left to infer the ALJ's overall evaluation of Robinson's credibility.  Social Security Ruling 96-7p provides that an ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the

weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7. Here, the ALJ has given specific reasons for doubts he has expressed about Robinson's credibility; however, the ALJ's precise determination regarding Robinson's credibility is not announced in clear terms.

Because I have already decided to remand the case on the several other grounds considered above, I need not decide whether these latter contentions by themselves also represent grounds for remand. It is clear, however, that the ALJ's opinion could be improved in these respects. Since the case will be remanded in any event, the ALJ is encouraged to provide a fuller and more explicit discussion of the weight he has assigned to Dr. Rudolph's and Dr. Rosenfeld's opinions and to state more clearly his assessment of Robinson's credibility.

## IV.

For the foregoing reasons, the parties' motions for summary judgment are denied, and the case is remanded to the Social Security Administration. On remand, the ALJ should, at a minimum, discuss: (1) whether Robinson meets Listing 11.19's requirements, giving proper attention to evidence of her difficulty in using her hands and feet; (2) whether Robinson meets the requirements of Listing 12.05 by assessing with greater precision the extent, if any, of Robinson's cognitive impairment, and whether any such impairment existed prior to her reaching twenty-two years of age;

(3) the weight assigned to the opinion of Dr. Free; and (4) the extent to which Robinson's other potential disabilities might be affected by her obesity.  In addition, in order to forestall further controversy over the adequacy of the ALJ's decision, the ALJ is encouraged to explain more fully: (1) the relative weight he has assigned to the opinions of Dr. Rudolph and Dr. Rosenfeld; and (2) his assessment of Robinson's credibility.

ENTER ORDER:

_____
**Elaine E. Bucklo**
United States District Judge

Dated: October 30, 2009